# Illinois Official Reports

## Appellate Court

*Helia Healthcare of Belleville, LLC v. Norwood*, 2017 IL App (1st) 152755

| | |
|---|---|
| Appellate Court Caption | HELIA HEALTHCARE OF BELLEVILLE, LLC; HELIA HEALTHCARE OF BENTON, LLC, HELIA HEALTHCARE OF CHAMPAIGN, LLC; HELIA HEALTHCARE OF ENERGY, LLC; BRIDGEMARK OF GREENVILLE, LLC; HELIA HEALTHCARE OF OLNEY, LLC; HELIA SOUTHBELT HEALTHCARE, LLC; FRANKFORT HEALTHCARE AND REHABILITATION CENTER, LLC; HELIA HEALTHCARE OF YORKVILLE, LLC; HELIA HEALTHCARE OF HILLSBORO, LLC; HELIA HEALTHCARE OF JERSEYVILLE, LLC; BURGESS SQUARE HEALTHCARE AND REHABILITATION CENTRE, LLC; DOCTORS NURSING AND REHABILITATION CENTER, LLC; DOUGLAS REHABILITATION AND CARE CENTER, LLC, d/b/a Douglas Nursing and Rehabilitation Center, and Evergreen Nursing and Rehabilitation Center, LLC; LIVING CENTERS, INC., d/b/a Imboden Creek Living Center; LEXINGTON HEALTH CARE CENTER OF BLOOMINGDALE, INC.; LEXINGTON HEALTH CARE CENTER OF CHICAGO RIDGE, INC.; LEXINGTON HEALTH CARE CENTER OF ELMHURST, INC.; LEXINGTON HEALTH CARE CENTER OF LA GRANGE, INC.; LEXINGTON HEALTH CARE CENTER OF LAKE ZURICH, INC.; LEXINGTON HEALTH CARE CENTER OF LOMBARD, INC.; LEXINGTON HEALTH CARE CENTER OF ORLAND PARK, INC.; LEXINGTON HEALTH CARE CENTER OF SCHAUMBURG, INC.; LEXINGTON HEALTH CARE CENTER OF STREAMWOOD, INC.; LEXINGTON HEALTH CARE CENTER OF WHEELING, INC.; PETERSEN HEALTH CARE, INC., d/b/a/ Arcola Health Care Center, Bement Health Care Center, Eastview Terrace, Havana Health Care Center, Kewanee Care Home, Robings Manor Rehabilitation and Health Care, and Sunset Rehabilitation and Health Care; PETERSEN HEALTH CARE II, INC., d/b/a Casey Health Care Center, Flora Rehabilitation and Health Care Center, Mt. Vernon Health Care Center, Palm Terrace of Mattoon, Royal Oaks Care Center, Sullivan Rehabilitation and Health Care Center, Swansea Rehabilitation and Health Care Center, Toulon Rehabilitation and Health Care Center, Twin Lakes Rehab and Health Care, Watseka Rehabilitation and Health Care Center, and White Oak |

Rehabilitation and Health Care Center; PETERSEN HEALTH SYSTEMS, INC., d/b/a Collinsville Rehabilitation and Health Care Center, Effingham Rehabilitation and Health Care Center, Sheldon Health Care Center, and Tuscola Health Care Center; SJL HEALTH SYSTEMS, INC., d/b/a Prairie Rose Health Care Center; PETERSEN HEALTH NETWORK, LLC, d/b/a Charleston Rehab and Health Care Center, Cumberland Rehab and Health Care Center, El Paso Health Care Center, Flannigan Rehabilitation and Health Care Center, Flora Gardens Care Center, Lebanon Care Center, Nokomis Rehabilitation and Health Care Center, Rochelle Gardens Care Center, Rochelle Rehabilitation and Health Care Center, and Willow Rose Rehab and Health Care; PETERSEN HEALTH CARE–OZARK, LLC, d/b/a Farmer City Rehab and Health Care; PETERSEN HEALTH CARE–ILLINI, LLC, d/b/a Illini Heritage Rehab and Health Care; PETERSEN HEALTH CARE V, LLC, d/b/a Marigold Rehabilitation and Health Care Center, and Polo Rehabilitation and Health Care Center; PETERSEN HEALTH CARE VII, LLC, d/b/a Mason Point; MIDWEST HEALTH OPERATIONS, LLC, d/b/a Aledo Rehabilitation and Health Care Center, La Harpe Davier Health Care Center, Piper City Rehab and Living Center, Prairie City Rehab and Health Care, and Shawnee Rose Care Center; PETERSEN HEALTH CARE–WESTSIDE, LLC, d/b/a Westside Rehabilitation and Care Center; PETERSEN HEALTH OPERATIONS, LLC, d/b/a Aspen Rehab and Health Care, Batavia Rehabilitation and Health Care Center, Benton Rehabilitation and Health Care Center, Bloomington Rehabilitation and Health Care Center, Cisne Rehabilitation and Health Center, Countryview Care Center of Macomb, Decatur Rehabilitation and Health Care Center, Eastside Health and Rehabilitation Center, Enfield Rehabilitation and Health Care Center, Fondulac Rehabilitation and Health Care Center, Jonesboro Rehabilitation and Health Care Center, McLeansboro Rehabilitation and Health Care Center, Newman Rehabilitation and Health Care Center, North Aurora Care Center, Rock Falls Rehabilitation and Health Care Center, Rosiclare Rehabilitation and Health Care Center, Sandwich Rehabilitation and Health Care Center, Shelbyville Rehabilitation and Health Care Center, South Elgin Rehabilitation and Health Care Center, Timbercreek Rehab and Health Care, and Vandalia Rehabilitation and Health Care Center; PETERSEN HEALTH OPERATIONS III, LLC, d/b/a Pleasant View Rehabilitation and Health Care; PETERSEN HEALTH CARE—ROSEVILLE, LLC, d/b/a Roseville Rehabilitation and Care Center, Cornerstone Rehabilitation and Health Care, Rock River Gardens, and Sauk Valley Senior Living and Rehab; UDI #6, LLC, d/b/a Care Center of Abingdon; UDI #5, LLC, d/b/a Manor Court of Carbondale; UDI #8, LLC, d/b/a Centralia Manor; UDI #11, LLC, d/b/a Jerseyville Manor; UDI #4, LLC, d/b/a Leroy Manor; UDI #2,

LLC, d/b/a Manor Court of Maryville; UDI #1, LLC, d/b/a Parkway Manor; UDI #10, LLC, d/b/a Pekin Manor; UDI #9, LLC, d/b/a Pittsfield Manor; UDI #7, LLC, d/b/a Seminary Manor; UDI #3, LLC, d/b/a Shelbyville Manor; RESIDENTIAL ALTERNATIVES OF ILLINOIS, INC., d/b/a Manor Court of Clinton, Hawthorne Inn of Danville, Manor Court of Freeport, Manor Court of Peoria, Manor Court of Peru, and Manor Court of Princeton; RESTHAVE HOME OF WHITESIDE COUNTY, ILLINOIS; CAHILL ROSEWOOD COMPANIES, d/b/a Rosewood Care Center of Alton, Rosewood Care Center East Peoria, Rosewood Care Center—Edwardsville, Rosewood Care Center of Elgin, Rosewood Care Center Galesburg, Rosewood Care Center Inverness, Rosewood Care Center of Joliet, Rosewood Care Center of Moline, Rosewood Care Center Northbrook, Rosewood Care Center of Peoria, Rosewood Care Center of Rockford, Rosewood Care Center St. Charles, and Rosewood Care Center Swansea; SSC HAMILTON OPERATING COMPANY LLC, d/b/a Montebello Healthcare Center; SSC MOUNT VERNON OPERATING COMPANY LLC, d/b/a Nature Trail Health Care Center; SSC ODIN OPERATING COMPANY LLC, d/b/a Odin Healthcare Center; SSC WESTCHESTER OPERATING COMPANY LLC, d/b/a Westchester Health and Rehabilitation Center; SOUTHGATE HEALTH CARE CENTER; SOUTHPOINT NURSING AND REHABILITATION CENTER; CALHOUN NURSING AND REHABILITATION CENTER, LLC; GRANITE NURSING AND REHABILITATION CENTER, LLC; STEARNS NURSING AND REHABILITATION CENTER, LLC; and WHITE HALL NURSING AND REHABILITATION CENTER, LLC, Plaintiffs-Appellants, v. FELICIA F. NORWOOD, Director of Healthcare and Family Services, and THE ILLINOIS DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES, Defendants-Appellees.

District & No.          First District, Third Division
                        Docket No. 1-15-2755


Rule 23 order filed     December 2, 2016
Rule 23 order
withdrawn               February 15, 2017
Opinion filed           March 15, 2017

- 3 -

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CH-11223; the Hon. LeRoy Martin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Duane Morris LLP, of Chicago (John T. Schriver, Nicholas J. Lynn, and John D. Kendzior, of counsel), for appellants.<br><br>Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Evan Siegel, Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1 The plaintiffs appeal from the trial court's dismissal of their complaint against the defendants, Felicia F. Norwood, the Director of Healthcare and Family Services, and the Illinois Department of Healthcare and Family Services (HFS or Department), under section 2-619(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(1) (West 2014)). The trial court concluded that it lacked subject matter jurisdiction over the plaintiffs' claims because the Court of Claims held exclusive jurisdiction. On appeal, the plaintiffs argue that the trial court erred in so concluding. For the reasons that follow, we affirm.

¶ 2 BACKGROUND

¶ 3 On July 23, 2015, the plaintiffs filed their two-count complaint for declaratory and injunctive relief against the defendants. In that complaint, the plaintiffs alleged the following. They are skilled nursing facilities in Illinois, licensed under the Nursing Home Care Act and certified to participate in the federal Medicaid program. The Department, of which Norwood is the director, is tasked with administering the Medicaid program within Illinois in accordance with federal law. As a part of its administration of the Medicaid program, HFS reimburses certified health care providers for covered medical care and services provided to Medicaid patients. Reimbursement is governed by Illinois statutes and regulations and is funded by appropriations from the Illinois General Revenue Fund (GRF), the Long-Term Care Provider Fund (Long-Term Fund), and the Health Care Provider Relief Fund (Relief Fund).

¶ 4 Effective March 26, 2015, the Illinois General Assembly passed section 5-5b.1 of the Illinois Public Aid Code, which provided in relevant part as follows:

"[P]roviders of the following services shall have their reimbursement rates or dispensing fees reduced for the remainder of State fiscal year 2015 by an amount equivalent to a 2.25% reduction in appropriations from the General Revenue Fund for the medical assistance program for the full fiscal year:

> (1) Nursing facility services delivered by a nursing facility licensed under the Nursing Home Care Act.

* * *

> (c) To the extent practical and subject to rescission if not federally approved, the reductions required under this Section must be applied uniformly among and within each group, class, subgroup, or category of providers listed in this Section." 305 ILCS 5/5-5b.1 (West Supp. 2015).

¶ 5    The plaintiffs further alleged that the reimbursement reductions provided for in section 5-5b.1 were to be applied to services rendered between May 1, 2015, and June 30, 2015, and that the plaintiffs were among those providers subject to the reimbursement reductions. According to the plaintiffs, figures published by the Department estimated that it would pay certified Medicaid providers licensed under the Nursing Home Care Act a total of $1,591,329,500 in fiscal year 2015. Of that amount, as of June 30, 2015 (the end of fiscal year 2015), $804,235,132 was paid out of the GRF. The plaintiffs then asserted that to effectuate reductions "by an amount equivalent to a 2.25% reduction in appropriations from the [GRF]," reimbursement rates for the listed providers would have to be cut by $22,417,300.

¶ 6    The plaintiffs alleged that in an "Informational Notice" dated May 1, 2015, Norwood, on behalf of the Department, advised long-term care facilities that their reimbursement rates would be reduced by 12.6% for dates of service between May 1, 2015, and June 30, 2015, without regard to the source of the reimbursements. According to the plaintiffs, reductions calculated in this manner, as opposed to being limited to funds from the GRF, would result in reductions exceeding the amount allowable pursuant to section 5-5b.1.

¶ 7    The plaintiffs also alleged that HFS concluded that some of the providers listed in section 5-5b.1 as being subject to the reductions could not actually be subjected to the reductions due to federal protections. In addition, in a "Notice of Emergency Amendment," HFS stated that the 12.6% reduction for services rendered between May 1, 2015, and June 30, 2015, would apply to skilled nursing facilities, unless they were operated by a unit of local government that provided the non-federal share of the Medicaid services.

¶ 8    According to the plaintiffs, "[b]y directing that HFS calculate the Medicaid rate reductions using all funds rather than limiting the reductions to appropriations from the [GRF], Norwood is acting in excess of her authority," and "[b]y directing that [skilled nursing facilities] be treated differently from other nursing facilities, Norwood and HFS are acting contrary to the mandate of [section 5-5b.1] that all categories of providers in each listed group have their rates reduced uniformly."

¶ 9    The plaintiffs requested that the trial court enter a declaratory judgment, requiring that (1) the reimbursement reductions comply with section 5-5b.1, (2) the reimbursement reductions come from the GRF only, (3) the reimbursement reductions not come from other sources of funding, including but not limited to the Long-Term Fund and the Relief Fund, (4) the reimbursement reductions be applied uniformly among and within the categories of Medicaid providers listed in section 5-5b.1, and (5) skilled nursing facilities not be treated differently

than any other nursing facilities with respect to the reimbursement reductions. The plaintiffs also requested that the trial court enter an injunction, barring the Department from implementing any reimbursement reductions under section 5-5b.1 until the trial court ruled on the plaintiffs' requested declaratory relief.

¶ 10　After filing their complaint, the plaintiffs requested that the trial court enter a temporary restraining order, enjoining the defendants from reducing Medicaid reimbursements until the trial court ruled on the plaintiffs' request for declaratory relief. The trial court denied the plaintiffs' motion.

¶ 11　The defendants filed a motion to dismiss the plaintiffs' complaint in which they argued that they were immune from suit under the doctrine of sovereign immunity and that the trial court lacked subject matter jurisdiction because the Court of Claims had exclusive jurisdiction. In response, the plaintiffs argued that sovereign immunity did not apply, because the defendants were acting outside the scope of their authority in that they sought to apply section 5-5b.1's reimbursement reductions to reimbursements the plaintiffs received from the Long-Term Fund and the Relief Fund, despite section 5-5b.1's mandate that the reimbursement reductions be applied only to reimbursements from the GRF.

¶ 12　After a hearing on the motion to dismiss, the trial court dismissed the plaintiffs' complaint. According to the trial court, the issue was not whether the defendants had the authority to make the reimbursement reduction calculations but whether they made the calculations correctly. Because the trial court did not view the issue as one of whether the defendants exceeded their authority but whether they exercised their authority correctly, it held that jurisdiction belonged to the Court of Claims. In addition, the trial court found that any declaration would essentially be moot because all of the reimbursements for the relevant time period would have been made by the time any declaration was issued. Thereafter, the plaintiffs brought this timely appeal.

¶ 13　　　　　　　　　　　　　　　　ANALYSIS

¶ 14　On appeal, the plaintiffs argue that the trial court erred in finding that subject matter jurisdiction belonged to the Court of Claims because the defendants exceeded their authority under section 5-5b.1, such that sovereign immunity did not apply. We disagree.

¶ 15　Section 2-619 of the Code of Civil Procedure permits a motion to dismiss when some affirmative matter, such as a lack of subject matter jurisdiction, avoids or defeats the claims in the complaint. 735 ILCS 5/2-619(a)(1) (West 2014); *Cortright v. Doyle*, 386 Ill. App. 3d 895, 899 (2008). Such a motion admits all well-pleaded facts and reasonable inferences therefrom, and all pleadings are construed in the light most favorable to the nonmoving party. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 31. Our task on appeal is to determine "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993). Our standard of review is *de novo*. *Id.* at 116.

¶ 16　The Illinois Constitution of 1970 abolished sovereign immunity in Illinois, except where the General Assembly provided for it by law. Ill. Const. 1970, art. XIII, § 4. In response, the General Assembly enacted the State Lawsuit Immunity Act, which provides that the State of Illinois cannot be made a defendant or party in any court, except as provided for in, among others, the Court of Claims Act. 745 ILCS 5/1 (West 2014). The Court of Claims Act, in turn, provides in relevant part that the Court of Claims has exclusive jurisdiction over "[a]ll claims

against the State founded upon any law of the State of Illinois." 705 ILCS 505/8(a) (West 2014). Naming a State employee as a defendant will not allow an end-run around the doctrine of sovereign immunity, as whether an action is against the State is determined by the issues raised and the relief sought not whether the State is named as a party. *Cortright*, 386 Ill. App. 3d at 900.

¶ 17  One exception to sovereign immunity—sometimes referred to as the officer suit exception—applies when the actions of an officer of the State exceed the scope of his or her statutory authority or when the officer acts under an unconstitutional statute. *PHL, Inc. v. Pullman Bank & Trust Co.*, 216 Ill. 2d 250, 261 (2005). This exception is based on the presumption that neither the State nor its departments violates the constitution or laws of Illinois; accordingly, if a department or one of its officers acts outside of its scope of authority, that unauthorized action is not viewed as an action of the State. *Id.*

¶ 18  According to the plaintiffs, the officer suit exception to sovereign immunity applies in the present case because the defendants acted outside the scope of their authority under section 5-5b.1. The defendants respond that they did not act outside the scope of their authority in implementing the reimbursement reductions because section 5-5b.1 simply caps the amount of reductions to be taken and leaves the method of implementing the reductions to the discretion of the defendants. Before we can determine whether the plaintiffs sufficiently pled that the defendants acted outside the scope of their authority, we must first determine what the scope of that authority is.

¶ 19  The primary goal in statutory construction is to ascertain the intent of the legislature. The best indicator of this intent is the language of the statute, which must be given its plain and ordinary meaning. *People ex rel. Madigan v. Bertrand*, 2012 IL App (1st) 111419, ¶ 20. In interpreting a statute, we must view the statute as a whole, making sure not to read any of its language in isolation. *Board of Education of Woodland Community Consolidated School District 50 v. Illinois State Charter School Comm'n*, 2016 IL App (1st) 151372, ¶ 38. We must avoid any interpretation that would render any portion of the statute superfluous, meaningless, or void. *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001). Just as we may not read out any portion of the statute, we may not alter the plain meaning of a statute's language by reading into it exceptions, limitations, or conditions not expressed by the legislature. *Board of Education*, 2016 IL App (1st) 151372, ¶ 34.

¶ 20  Before delving into our interpretation of section 5-5b.1, we note that, although the plaintiffs criticize the defendants for supposedly failing to provide a clear statement of their interpretation of section 5-5b.1, the plaintiffs themselves have failed to provide a clear statement on appeal of their interpretation. Rather, the plaintiffs simply quote the language of section 5-5b.1 and state that the defendants exceeded their authority by making "across-the-board" reductions in an amount exceeding that provided for under section 5-5b.1 without explaining how section 5-5b.1 is supposed to be applied. The plaintiffs also do not explain how this comports with their arguments in the trial court that the defendants exceeded their authority by applying the reimbursement reductions to reimbursements from funds other than the GRF. Because of the lack of clarity by the plaintiffs, we have had to look to the plaintiffs' arguments in the trial court to determine how, exactly, the plaintiffs claim section 5-5b.1 should be interpreted. We note, however, that it is the appellant's duty under Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008) to present a clear statement of its contentions on appeals; contentions that are ill-defined and insufficiently presented do not satisfy this rule.

*Gandy v. Kimbrough*, 406 Ill. App. 3d 867, 875 (2010). Accordingly, whether the plaintiffs' vagueness in its appellate briefs was intentional or accidental, the plaintiffs would be well advised to clearly state and explain their statutory interpretations in future appeals.

Nevertheless, from our review of the plaintiffs' appellate briefs and their arguments in the trial court, our understanding of their interpretation of section 5-5b.1 is as follows: from each reimbursement check actually issued, that portion of the reimbursement that is funded by the GRF is to be reduced by 2.25%. Accordingly, per the plaintiffs, section 5-5b.1 limits not just the amount of the reductions but the specific funds to which the reductions may be applied. To illustrate, suppose that one of the plaintiffs was to receive reimbursement for $1000 worth of covered medical services. Under pre-section 5.5b.1 reimbursement rates, of that $1000, $200 would have come from the GRF, $300 from the Long-Term Fund, and the remaining $500 from the Relief Fund. Under the plaintiffs' interpretation, section 5-5b.1 authorizes the defendants to reduce only the $200 from the GRF and only by 2.25%, resulting in a reduction of $4.50 ($200 x .0225). The $800 from the other two funds would remain untouched, meaning that the plaintiff would receive a total reimbursement of $995.50. Likewise, under the plaintiffs' interpretation, if that $1000 was to be comprised only of funds from the Long-Term Fund and/or the Relief Fund, the defendants would have no authority to apply any reductions to the reimbursement. Thus, it is our understanding that the plaintiffs believe that the defendants violated this authority by reducing *all* funds—not just those that were actually taken out of the GRF—by 2.25%, resulting in greater reductions than if only funds distributed from the GRF were reduced by 2.25%.

Our understanding of the plaintiffs' position is based on the following statements by the plaintiffs in the record on appeal and in their appellate briefs:

"Should the reimbursements to providers be reduced as set forth in the Informational Notice, rather than be limited as required by [section 5-5b.1] to funds from the [GRF], the reductions to the listed Medicaid providers will be substantially more than the amount allowable under [section 5-5b.1]" (plaintiffs' complaint).

"By directing that HFS calculate the Medicaid rate reductions using all funds rather than limiting the reductions to appropriations from the [GRF], Norwood is acting in excess of her authority ***" (plaintiffs' complaint).

"Plaintiffs make similar factual allegations to the *Wilson* [*v. Quinn*, 2013 IL App (5th) 120337] plaintiffs by alleging that [section 5-5b.1] requires reductions be made only to appropriations from the [GRF], Plaintiffs receive appropriations from the [GRF], the Long-Term Care Provider Fund and the Health Care Provider Relief Fund, and Defendants' 'Informational Notice' allows for reductions to reimbursement appropriations from any fund" (plaintiffs' response to defendants' section 2-619 motion to dismiss).

"We maintain, and I believe the statute is clear, that the rate reductions authorized by that statute are limited to funds taken from the Illinois General Fund" (hearing on the plaintiffs' motion for temporary restraining order).

There's nothing discretionary there, Judge. That's mandatory, shall have their rates reduced from funds taken from the [GRF]" (hearing on the defendants' motion to dismiss).

"I can see two readings of that, two interpretations of that. One is that the reduction is limited to funds coming from the [GRF], and we've pleaded that. The other interpretation could be that regardless of the source of funds, there was a cap on how much the reductions should be, and that is 2.25 percent of that coming out of the [GRF]" (hearing on the defendants' motion to dismiss).

"We're stating and alleging in our complaint that they are taking the funds, taking the monies from which the reductions are made, from sources that are not authorized by the statute; but differently, they're making reductions from all sources of funds not just the [GRF]" (hearing on the defendants' motion to dismiss).

"As set forth in the Complaint at paragraphs 30 and 31, funds paid out of the [GRF] account for only slightly more than 50% of the total sum paid to Medicaid providers. [Citation.] An across-the-board reduction of 12.6% basically doubles the reduction in reimbursements mandated by the Act" (plaintiffs' appellate brief).

¶ 23 Having identified what we believe to be the plaintiffs' interpretation of the scope of authority provided to the defendants by section 5-5b.1, we turn now to whether that interpretation is supported by the language of section 5-5b.1. We conclude that it is not.

¶ 24 As stated earlier, section 5-5b.1 provided that reimbursement rates for the remainder of fiscal year 2015 were to be reduced "by an amount equivalent to a 2.25% reduction in appropriations from the [GRF] for the medical assistance program for the full fiscal year." 305 ILCS 5/5-5b.1(a) (West Supp. 2015). We conclude that the language of section 5-5b.1 clearly provides for a simple cap on the amount of reimbursement reductions to be made. That cap is to be calculated by multiplying the total appropriations from the GRF for the Medicaid program in fiscal year 2015 by 2.25%. For example, if $500,000,000 from the GRF was appropriated—not necessarily actually paid out, but appropriated by the General Assembly—for the Medicaid program for fiscal year 2015, the total amount of reimbursement reductions to be made is $11,250,000 ($500,000,000 x 0.0225). The language of section 5-5b.1 does not limit how that cap is to be reached, just that it be reached. Accordingly, as we read the statute, the defendants were authorized to make the reductions as they saw fit—to any reimbursement funds they saw fit—so long as the amount of the total reductions did not exceed 2.25% of that year's GRF Medicare appropriations.

¶ 25 We reach this conclusion based on the plain language of section 5-5b.1. The language refers to "an amount equivalent to" 2.25 % of the GRF Medicaid appropriations. By using the phrase "an amount equivalent to," the General Assembly indicated that it was using 2.25% of the GRF Medicaid appropriations as a general benchmark for calculating the total reductions to be made. After all, if the General Assembly intended to reduce only those funds paid out of the GRF by 2.25%, it could simply have reduced its Medicaid appropriation from the GRF by 2.25%, thereby eliminating the need for any calculations by anyone other than the General Assembly, or it could have simply stated that all payments from the GRF were to be reduced by 2.25%. To read section 5-5b.1 as the plaintiffs do—as calling for the reduction of only those funds paid out of the GRF—is to completely read out the words "an amount equivalent to," which we are not permitted to do. *Sylvester*, 197 Ill. 2d at 232.

¶ 26 Moreover, to read section 5-5b.1 as the plaintiffs contend we should would be to equate the term "appropriations" with Medicaid reimbursements, as section 5-5b.1 calls for reductions in an amount equal to 2.25% of the GRF Medicaid "appropriations." Yet, the plaintiffs claim that

this means a 2.25% reduction in their Medicaid *reimbursements* paid out of the GRF. We cannot agree with that interpretation. First, the term appropriation is generally understood, in this context, as meaning "[p]ublic funds set aside for a specific purpose" or "[a] legislative act authorizing the expenditure of a designated amount of public funds for a specific purpose." American Heritage Dictionary 64 (1981); see also *Cojeunaze Nursing Center v. Lumpkin*, 260 Ill. App. 3d 1024, 1029 (1994) ("In the absence of a statutory definition indicating a different legislative intent words are to be given their ordinary and commonly understood meaning."). Thus, in this context, appropriation refers to the money set aside by the General Assembly to help fund the Medicaid reimbursements but does not refer to the actual reimbursement payments made to the Medicaid providers for covered services. Second, the General Assembly, within the language of section 5-5b.1, demonstrated that it did not view payments to Medicaid providers as "appropriations," given that it referred to reductions in the providers' "*reimbursement* rates" not "appropriation rates." (Emphasis added.) 305 ILCS 5/5-5b.1 (West Supp. 2015); see *Aurora Pizza Hut, Inc. v. Hayter*, 79 Ill. App. 3d 1102, 1105-06 (1979) ("An elementary canon of statutory construction teaches us that where the legislature uses certain words in one instance, and different words in another, different results were intended.").

¶ 27        Finally, we observe that nowhere in the language of section 5-5b.1 did the General Assembly impose any explicit conditions that the 2.25% reimbursement reductions be applied only to those reimbursements actually made out of the GRF—as opposed to simply reducing Medicaid reimbursements by an amount equal to 2.25% of the amount set aside in the GRF for the Medicaid program in fiscal year 2015. Because the General Assembly chose not to impose any such conditions, we cannot read them into the statute. *Board of Education*, 2016 IL App (1st) 151372, ¶ 34.

¶ 28        Having concluded that section 5-5b.1 only imposes a specific amount of reimbursement reductions to be made for fiscal year 2015 but leaves it to the defendants to determine how to reach that amount, we turn to the question of whether the plaintiffs adequately pleaded that the defendants somehow acted outside that authority. We first note that the plaintiffs make no contention on appeal that the defendants exceeded the scope of their authority even if we were to conclude, as we do, that section 5-5b.1 limits only the total amount of reductions to be implemented. Presumably, this is because the plaintiffs' position that the defendants exceeded the scope of their authority depends entirely on their interpretation of section 5-5b.1 that the reimbursement reductions were limited to reducing actual payments from the GRF by 2.25%.

¶ 29        Nevertheless, we have examined the plaintiffs' complaint to assess whether they have somehow pled a violation of section 5-5b.1. We conclude that they have not. Even taking all of the plaintiffs' allegations as true, which we must do in reviewing a section 2-619 motion to dismiss, they have not alleged that the reimbursement reductions implemented by the defendants exceeded 2.25% of the total GRF Medicaid appropriation. Rather, they pleaded that the defendants were only permitted to reduce reimbursement rates by $22,417,300 and that, because the defendants intended to apply reductions to payments made from funds other than the GRF, the total reductions would exceed $22,417,300. The plaintiffs did not plead that $22,417,300 was equal to 2.25% of the total GRF Medicaid appropriation (it is unclear how, exactly, the plaintiffs reached $22,417,300 as the amount of reductions authorized under section 5-5b.1), such that we could infer from an allegation that the reductions exceeded $22,417,300 and also exceeded 2.25% of the total GRF Medicaid appropriation. The plaintiffs also did not plead any facts that would allow us to calculate 2.25% of the total GRF Medicaid

appropriation or the total reductions to be made by the defendants, such that we could assess whether the plaintiffs—although not agreeing with our interpretation of section 5-5b.1—could nevertheless be said to have pleaded a violation of it.

¶ 30   We also note that the plaintiffs pleaded that the defendants exceeded their authority because they intended to apply the reimbursement reductions to skilled nursing facilities differently than other nursing facilities. Although section 5-5b.1 does direct that the reductions be applied uniformly to the providers listed, that direction is qualified by the phrase "[t]o the extent practical," thus leaving it to the defendants to determine whether uniform application of the reimbursement reductions is practical. The plaintiffs have not pleaded any facts that, even if taken as true, would suggest that uniform application was practical under the circumstances.

¶ 31   Because section 5-5b.1 permits the defendants to implement the reimbursement reductions in the manner they see fit, so long as the total reductions do not exceed 2.25% of the total GRF Medicaid appropriation for fiscal year 2015, the plaintiffs' allegations that the defendants applied the reimbursement reductions to funds other than the GRF, even when taken as true, do not establish that the defendants exceeded the scope of their authority. Moreover, the plaintiffs did not plead any other facts that would establish that the defendants implemented reductions exceeding 2.25% of the total GRF Medicaid appropriation for fiscal year 2015. Accordingly, the plaintiffs have not established that the officer suit exception to sovereign immunity applies.

¶ 32   As the plaintiffs have offered no other exception to the application of sovereign immunity, and as the plaintiffs' claims are based on a law of the State of Illinois—section 5-5b.1—the Court of Claims holds exclusive jurisdiction over this matter (705 ILCS 505/8(a) (West 2014)), and the trial court did not err in granting the defendants' motion to dismiss.

¶ 33   Because we conclude that the trial court was correct in dismissing the plaintiffs' complaint for lack of subject matter jurisdiction, we need not address the plaintiffs' contention that the trial court erred in finding that it could not grant effective relief.

¶ 34                                          CONCLUSION

¶ 35   For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

¶ 36   Affirmed.